UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:23-CV-83

| | |
|---|---|
| STEPHANIE WALKER<br><br>**Plaintiff**<br><br>v.<br><br>CITY OF CHARLOTTE, NORTH CAROLINA<br><br>**Defendant** | **COMPLAINT**<br><br>**WITH DEMAND FOR TRIAL BY JURY** |

**NOW COMES** Plaintiff, Stephanie Walker, by and through Counsel, and pursuant to N.C. Gen. Stat. § 40A-3(b), and North Carolina tort law, the North Carolina Constitution and the United States Constitution, respectfully pleads to this Court the following:

## JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court pursuant to 28 U.S. Code § 1331 - Federal question, and 28 U.S. Code § 1367 - Supplemental jurisdiction.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

## PARTIES

3. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

4. Stephanie Walker ("Plaintiff") is an individual and citizen of the State of North Carolina who currently resides in the City of Charlotte, Mecklenburg County, North Carolina.

5. Defendant City of Charlotte ("City") is a duly organized and existing North Carolina municipal corporation.

6. At all times relevant to this action Charlotte was a "Local Public Condemnor" as defined by N.C. Gen. Stat. § 40A-3(b).

7. The City can be reached for service through R. Harcourt Fulton, City Attorney, 600 E. 4th St., 7th Floor, #740, Charlotte, North Carolina, 28202.

## FACTS

8. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

9. At all times relevant to this action, Plaintiff Stephanie Walker was the fee simple owner of the property located at 5130 Granite Creek Lane, Charlotte, North Carolina.

10. The City owns and operates the sewer and the sewer system for the purpose of providing and selling sewer services to the people of Charlotte and others.

11. The sewer system and the sale of sewer services is a proprietary function of the City.

12. Upon information and belief, the City constructed the sewer main adjacent to Ms. Walker's Property.

13. Upon information and belief, the City installed and operated the sewer main adjacent to Ms. Walker's Property.

14. Upon information and belief, the City is responsible for maintaining the sewer main adjacent to Ms. Walker's Property.

15. Upon information and belief, the City is responsible for repairing the sewer main adjacent to Ms. Walker's Property.

16. The City's sewer main adjacent to Ms. Walker's property was installed for the public purpose of transporting sewage from the residents of Charlotte within the right of way of Granite Creek Lane.

17. On February 15, 2022, in the early morning, the City's sewer main was clogged by a roll of sheetrock tape, causing a tremendous amount of sewage backflow to gush into Ms. Walker's home through her toilet.

18. The same backflow intruded into the home of the neighbor adjacent to Ms. Walker's home.

19. The tremendous volume of sewage from the City's sewer main caused raw sewage to enter Ms. Walker's home, flooding it with several inches of sewage and causing substantial damages to Ms. Walker's real and personal property.

20. Ms. Walker is a widow of advanced years and lives on a very meager income that she receives from working in her church two days per week to supplement her social security.

21. Ms. Walker could not afford to pay for the damages to her home and personal property.

22. Initially the City offered the Plaintiff $15,000 for all repairs to Ms. Walker's home, regardless of the true amount of damages, pursuant to the City's program for remuneration for such instances, which set a maximum default for recovery to homeowners whose property is damaged due to backflow from the City's sewer system.

23. The City's adjuster approached Ms. Walker as she was standing in her yard, while sewage flowed through her house and spewed from the checkpoint in her yard.

24. Ms. Walker was in a state of shock and disbelief.

25. Ms. Walker could not enter her home immediately because of the ongoing condition.

26. Ms. Walker was not represented by any counsel and was not given a copy of any paperwork that she was presented with at that time.

27. Weeks later Ms. Walker was provided with a copy of the paperwork that she was ostensibly given at the time, which purports to be an "Initial Agreement and Release (the IAR)."

28. The IAR was not dated to the day, but the year on the IAR is listed as 2021.

29. A separate page appears to be signed by Ms. Walker.

30. The IAR purports to offer the Claimant up to $15,000 in remuneration for damages "as a result of the backup of sewage…"

31. The IAR required the release of all other claims against the City.

32. The IAR required Ms. Walker to agree to a Final Agreement and Release (the FAR) before funds would be distributed.

33. The IAR stated that a copy of the FAR was attached.

34. No copy of the FAR was attached and Ms. Walker did not receive a copy of the FAR.

35. Ms. Walker learned that the City has presented the same or similar kind of IAR to her neighbor whose house was flooded with sewage and she was also not given a copy of any agreement.

36. The City's adjuster provided Ms. Walker with the names of several preferred vendors to repair the damage that had occurred.

37. Ms. Walker immediately contacted Cardinal Restoration (Cardinal).

38. Cardinal estimated the damage repairs to the interior of her home, *excluding* her personal property, to be $38,200.

39. This estimate was calculated by using the least expensive materials that Cardinal could source.

40. This did not consider any of the damage to Ms. Walker's furniture, clothing, and other personal property, nor her time out of her home.

41. There were other expenses as well; by example, Ms. Walker could not afford to rent a hotel room, and the City would not pay for one, so she had to stay with a relative almost an hour from her work.

42. This added expense and aggravation that was no fault of her own.

43. Ms. Walker's home was completely devalued to her as she could not live in it because of the condition of the house; it was unclean and unsafe.

44. Ms. Walker was then referred to counsel who attempted to get the City to cover all of Ms. Walker's damages, including her personal property.

45. Counsel advised the City that Ms. Walker's damages to her house alone exceeded $38,000 and she also lost a significant amount of her personal property because it was soaked in her neighborhood's sewage, and she had lost the use of her home as well.

46. Counsel explained that the emotional impact to Ms. Walker was significant.

47. Initially the City refused to pay more.

48. Eventually, after the local news covered the story, the City offered $45,000 to cover Ms. Walker's losses.

49. Counsel explained again to the City that Ms. Walker's expenses greatly exceeded that amount.

50. Ms. Walker was in a quandary because Cardinal could not start work before it was guaranteed payment, Ms. Walker did not have the money to pay Cardinal and the City would not guarantee any payment to Cardinal until after Ms. Walker signed the IAR.

51. Discussions continued between the City and Ms. Walker's counsel and the City drafted an even more restrictive agreement between Ms. Walker and the City.

52. The City now required a complete waiver of all claims and a waiver of certain proof requirements if she did sue the City.

53. Eventually the City sent Ms. Walker a Release of All Claims (the RAC).

54. The RAC forced Ms. Walker to waive any and all claims for any damages of any kind

against the City in exchange for $45,000.

55. On July 6, 2022, the City wrote counsel:

> Shane,
>
> Pursuant to our conversation this morning, the City will pay for your client's mitigation and restoration costs up to the cap of $45,000, pursuant to the City's sewer backup plan.
>
> We understand that you will make appropriate arrangements with Cardinal Restoration in this regard.
>
> A precondition of the City making such payments, your client must execute and deliver the City's Initial and Final Agreements. I understand that you have copies of these agreements.
>
> Thank you for your cooperation.
>
> Court Fulton
> Senior Assistant City Attorney

56. Counsel responded on July 6, 2022:

> Court, *et al.*,
>
> We definitely appreciate the increase in the sewer backup program plan. We hope this won't be used in the future, but we are glad it's there when it is necessary. However, there are some concerns.
>
> First, will the city still install the backflow preventer?
>
> Next, while we believe the increase in the plan payment will cover the cost of remediation and restoration to Ms. Walker's home, there are other factors to consider. Ms. Walker is being asked to sign a waiver of her rights to any further compensation. Why? How is this fair? She lost her furniture in this incident. When her house is restored, she literally has no furniture to move into the house. Do you suggest she sleep on the floor? She had a sewing room with several bolts of cloth. That was all ruined. She did not ask for any of this to happen. It literally invaded her home. Is she supposed to go looking for furniture to buy? These are not rhetorical questions. I would like a real answer. Does Charlotte expect Ms. Walker to go buy furniture?
>
> When this started I said I wouldn't mind spending a few minutes on the phone to help her. I thought this would be an easy resolution. But at this point I have spent over 30 hours working on this case. I don't think I should have to work for free to

bring about a resolution that should have come early in this process. And we all know she would have never seen an increase in the plan payment if she had not had representation.

We do not want to sue the city. Please understand that. But asking her to waive any rights to further compensation so that she can get the program funds that should be automatic is not fair dealing. This act is antithetical to a city "for the people." Ms. Walker pays her taxes; she should not have to sign away her rights to compensation to get this plan money. Why is she being asked to do this? Why is it not paid automatically when the city sees that its sewer backup caused a problem?

Finally, you have asked Ms. Walker to contact Cardinal. When she tells this company that she is not signing a waiver and they will not be paid until she does, they will not perform any work. Who would? So we are back at square one.

I would like some clarification on this issue. I have asked Ms. Walker to estimate what she lost in furniture. My fees to date are over $10,000 (30 hours @$350/hour) but I would stipulate to that amount if this is resolved quickly. Otherwise, the city is literally forcing us to sue it and nobody wants that.

Best regards,
Shane Perry

57. On July 6, 2022, the City responded:

Shane,

The backwater valve has been installed by MD Plumbing & Mechanical. The City paid for that.

You may represent to Cardinal that the City will pay its invoices up to the $45,000 cap.

Otherwise, we are not in a position to opine on your client's legal options, if any.

Court Fulton
Senior Assistant City Attorney

58. The City knew that this did not cover all of Ms. Walker's damages.

59. The City knew it was at fault for damaging Ms. Walker's property.

60. That email was followed by another the same day:

Shane,

> To be clear, as I stated before, any such payment by the City is expressly contingent upon your client Stephanie Walker executing the Initial Agreement and Release and the Final Agreement and Release, provided to you previously, and delivery of the executed documents to the undersigned.
>
> Thank you for your cooperation.
>
> Court Fulton
> Senior Assistant City Attorney

61. The City's utter disregard for the plight of a Charlottean that it damaged is appalling and shows the intent of the City to take advantage of underprivileged citizens.

62. On July 7, 2022, counsel informed the City that the Plaintiff did not have a bed to sleep on because it had been damaged by the sewage.

63. The City responded on July 8, 2022:

    > Shane,
    >
    > We might suggest that your client might make a claim for the actual cash value of any damaged contents or furniture.
    >
    > That is a suggestion only. It is not legal advice or any representation by the City's as to its legal liability or other obligation in this matter.
    >
    > Any such payment would count toward the $45,000 cap under the City's sewer backup program, as we have discussed. Any such payment is expressly contingent upon your client Stephanie Walker executing the Initial Agreement and Release and the Final Agreement and Release, provided to you previously, and delivery of the executed documents to the undersigned.
    >
    > Court Fulton
    > Senior Assistant City Attorney

64. But the City knew that this amount did not come close to covering Ms. Walker's damages.

65. Counsel advised the City that Ms. Walker was desperate enough that she would settle the claim for $65,000, but that it was only out of sheer desperation because she was no longer able to live with relatives and she had been without her home and personal property for over

six months.

66. The city rejected the offer out of hand, simply reiterating the new policy limit of $45,000, which ignored the reality of Ms. Walker's situation.

67. Because of her meager pay and inability to earn more because of her age, Ms. Walker had no hope of paying for the damage to get back in her home.

68. A Go Fund Me set up to help her only garnered one donation of $10.00.

69. By August Ms. Walker was so desperate that she agreed to sign the RAC because she was literally homeless and she knew she could at least sleep on the floor of her home if it were repaired.

70. On August 8, 2022, counsel responded:

    Court, *et al*.,

    I am aware that $65,000 is more than $45,000.

    At this point Ms. Walker is losing her housing and will be sleeping in her car. She has no other options and she has no choice but to sign this release out of desperation. She's in her late 70s and she won't last long living in her car. So send over a clean copy of the release as soon as possible.

    Shane Perry

71. The City assured Ms. Walker that it would not pay any money for the damages it caused until she signed the RAC.

72. Because she had absolutely no other choice, on August 10, 2022, Ms. Walker signed the RAC.

73. Below her signature she wrote, "I'm homeless and I don't have another choice."

74. With unmitigated heartlessness, the City rejected this RAC and insisted that she sign another copy without the addendum.

75. On August 10, 2022, the City wrote:

> Shane,
>
> Unfortunately, we cannot accept this Release as altered, *inter alia*, as it appears to intend to put the City on notice that the Release was not signed freely and under no duress.
>
> Court Fulton
> Senior Assistant City Attorney

76. On August 10, 2022, counsel replied:

   > The city is already on notice that she has no options. I have told you that she is homeless and has no money to fix what the city has done. But I will have her sign a release that is unaltered unless you are saying that the city is retracting its offer.

77. The City accepted the RAC that Ms. Walker signed under undue influence.

78. The City knew or should have known Ms. Walker was asserting claims on February 15, 2022, or shortly thereafter and should have asserted an immediate litigation hold.

79. By letter dated June 1, 2022, Ms. Walker's counsel gave the City notice to preserve the broken sewer main pipe and other documents.

80. After Ms. Walker signed the RAC, the City paid $45,000 to her, which she was required to give to Cardinal.

81. Cardinal began work on her home soon after.

82. At this date, the restoration is nearing completion, but Ms. Walker has not been compensated for her personal property, the time she lost from her home, her expenses because of being displaced, her emotional distress, and other damages to be determined by a jury.

### **UNDUE INFLUENCE**

83. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

84. Ms. Walker was a victim of undue influence.

85. The following facts demonstrate that Ms. Walker was a person susceptible to the undue influence that was exercised against her and that her will was overcome:

    a) her economic condition: she had no money to restore her home;
    b) her age: she is in her late 70s;
    c) her extreme lack of bargaining power against the City government;
    d) her physical and mental condition: she was extremely stressed by losing her home at this time in her life and with so few resources;
    e) the unfairness of the RAC which ignored both the City's liability and the actual damages to Ms. Walker;
    f) the lack of independent consideration for the RAC;
    g) the relationship between Ms. Walker and the City: as a taxpayer, she relies on the City to protect her interests; and,
    h) most importantly, the fact that Ms. Walker was a victim in distress and in an emergency situation.

86. No reasonable person would have signed the RAC because of its egregiousness.

87. The city knew of its position of power over Ms. Walker and her inability to resist the City.

88. The waiver of rights should be set aside as determined at trial by a jury.

## **NEGLIGENCE**

89. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

90. At all times relevant hereto, the City owned the sewer main.

91. The City had a duty to use reasonable, ordinary care in the installation, maintenance, inspection of, and repair of the sewer main and is liable for injuries and damages resulting from the City's failure to exercise such reasonable, ordinary care.

92. The City's failure to use reasonable, ordinary care in the installation of the sewer main caused foreseeable damage to Ms. Walker's property.

93. The City's failure to use reasonable, ordinary care in the maintenance and inspection of the sewer main caused foreseeable damage to Ms. Walker's property.

94. The City's failure to use reasonable, ordinary care in the repair of the sewer main caused

foreseeable damage to Ms. Walker's property.

95. The City's failure to use reasonable, ordinary care in the installation, inspection, maintenance, and repair of the sewer main constitutes a breach of its duty to Ms. Walker.

96. The City's failure to cut off the water gushing from the sewer main and into Ms. Walker's home on February 15, 2022, within a reasonable time also constitutes a breach of its duty to properly repair the sewer main and protect Ms. Walker's property from injury.

97. The City's failure to require backflow preventers at Ms. Walker's residence, which would have kept the sewage from backing up from the sewer main and into Ms. Walker's home, constitutes a breach of its duty to Ms. Walker.

98. The City's failure to warn Ms. Walker of the need for backflow preventers constitutes a breach of its duty to Ms. Walker.

99. The City's failure to keep out objects from the sewer main such as the roll of sheetrock tape which caused the backup into Ms. Walker's home constitutes a breach of its duty to Ms. Walker.

100. Upon information and belief, had the sewer main been properly installed, maintained, inspected, and repaired, Ms. Walker would not have suffered damages on February 15, 2022.

101. As a result of the City's negligence, Ms. Walker has incurred significant monetary damages.

102. As a result of the City's failure to properly install, inspect, maintain and repair the sewer main, the City is liable Ms. Walker for damages in an amount to be determined at trial by a jury.

## PRIVATE NUISANCE

103. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

104. At all times relevant to this action, Ms. Walker had a right and interest in the private use and enjoyment of her Property.

105. As described above, the City's installation, maintenance, inspection and repair of the sewer main constitutes negligence.

106. The City's negligence and resulting flooding of Ms. Walker's Property with sewage substantially and unreasonably interfered with Ms. Walker's use and enjoyment of her real and personal property.

107. The City's conduct as set forth herein resulted in the damage to Ms. Walker's Property including a substantial reduction in the fair market value for a period of time, and therefore the City is liable to Ms. Walker for private nuisance in an amount to be determined at trial by a jury.

## INVERSE CONDEMNATION OF A TEMPORARY SEWAGE EASEMENT
## N.C. Gen. Stat. §40A-51

108. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

109. This claim is for inverse condemnation of a temporary sewage easement by the City and for damages to Ms. Walker's property on February 15, 2022, that began when the water from the City's sewer main flooded her property.

110. The temporary sewage easement and the flooding caused by the City's sewer main, negatively impacted and completely deprived Ms. Walker of the ability to dispose of her

property at fair market value or at any value.

111. The City is a municipal corporation which has the rights conveyed it to by the State of North Carolina including eminent domain.

112. At all relevant times herein, Stephanie Walker owned, and still owns, the real property located in the City of Charlotte, Mecklenburg County at 5130 Granite Creek Lane, Charlotte, North Carolina.

113. The conduct of the City in allowing its sewer main, that was within its sole care, custody and control, to become clogged and flood Ms. Walker's property with sewage constitutes a temporary taking of a sewage easement over Ms. Walker's property that caused damages.

114. These acts described above rendered Ms. Walker's property unmarketable at fair market value and depressed its fair market value for a period of time until repaired.

115. Upon information and belief, the City has treated similarly situated property owners differently by paying some property owners for all of the damages to their property caused by broken sewer mains and other broken City water pipes while paying Ms. Walker for only part of her damages, have deprived Ms. Walker of the value of her property, have substantially interfered with Ms. Walker's elemental and fundamental state constitutional rights growing out of the ownership of the property, and have restricted Ms. Walker's capacity to freely dispose, use and enjoy her property.

116. The City's actions have deprived Ms. Walker of the free and unhindered use of her property, have destroyed and nullified her property's value, and have abridged and destroyed Ms. Walker's right to dispose, use or enjoy her property in a substantial degree resulting in injuries which are not merely consequential or incidental.

117. The City's actions have resulted in the temporary taking of a sewage easement by inverse

condemnation of Ms. Walker's property pursuant to N.C. Gen. Stat. § 40A-51 for which Ms. Walker is entitled to recover just compensation, interest, costs, reimbursement of taxes, and attorneys' fees pursuant to Chapter 40A of the North Carolina General Statutes.

## **VIOLATION OF THE NORTH CAROLINA CONSTITUTION**

118. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

119. The actions by the City constitute a wrongful taking of a temporary sewage easement over the Plaintiffs' property, and, upon information and belief, due process and equal protection violations by treating others differently than Plaintiffs in similar situations without any legal basis in violation of Article I, Section 19 of the North Carolina Constitution.

120. This taking entitles Ms. Walker to just compensation arising from such taking in an amount to be determined at trial by a jury.

## **VIOLATION OF THE UNITED STATES CONSTITUTION**

121. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

122. The actions of the City as described herein constitute an unlawful taking in derogation or violation of the Fifth Amendment of the United States Constitution as applied to the State of North Carolina pursuant to the Fourteenth Amendment to the United States Constitution.

123. To wit: the Plaintiff's property was taken for public use without just compensation.

124. This taking entitles the Plaintiff to just compensation arising from such taking in an amount to be determined at trial by a jury.

## **DEMAND FOR JURY TRIAL**

125. Plaintiff exercises her right to a trial by jury on all issues so triable.

**WHEREFORE,** Plaintiffs respectfully prays the Court that Ms. Walker recovers the following:

1. A judgment against the City for compensatory damages under the first and second claim for relief plus interest thereon at the highest rate allowed by law from February 15, 2022, until paid in full;

2. A judgment against the City of Charlotte for damages arising out of the City's temporary taking by inverse condemnation of Ms. Walker's property and violation of Ms. Walker's constitutional rights under the North Carolina Constitution and United States Constitution;

3. A judgment against the City for Ms. Walker's reasonable attorneys' fees, appraisal, engineering, and other fees as provided by N.C.G.S. § 40A-8 and Article I, section 19 of the North Carolina Constitution and North Carolina law, and the United States Constitution;

4. Interest at the maximum legal rate on all amounts awarded herein from February 15, 2022, until paid pursuant to N.C.G.S. § 40A- 53;

5. A judgment that sets aside any waiver of rights that Ms. Walker signed due to undue influence;

6. Plaintiffs recover reasonable attorneys' fees as allowed by law;

7. Plaintiffs recover the costs of this action from the Defendant; and

8. Such other and further relief that as Court deems just and proper.

**TODAY** is February 13, 2023.

                                    **COLLUM & PERRY**
By:    */s/ M. Shane Perry*
        M. Shane Perry
        NC Bar Number: 35498
        109 W. Statesville Ave.,
        Mooresville, NC 28115
        Telephone: 704-663-4187
        Facsimile:  704-663-4178
        shane@collumperry.com
        *Attorney for Plaintiffs*